(No. 13990.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HENRY ULLRICH *et al.* Plaintiffs in Error.

*Opinion filed October 22, 1921.*

1. CRIMINAL LAW—*what constitutes the confidence game.* Under the Confidence Game statute the offense consists in gaining possession of money or property by means of some trick or device or swindling operation in which advantage is taken of the confidence which the victim has reposed in the swindler.

2. SAME—*what evidence of other transactions is mere hearsay in prosecution for confidence game.* In a prosecution for the confidence game, evidence of transactions of a nature similar to those in question is admissible for the purpose of showing guilty knowledge; but an investigator for the State's attorney's office should not be allowed to testify as to complaints against the defendants which were made to him by different parties as to similar transactions about which he has no personal knowledge, as such testimony is mere hearsay.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. CHARLES M. THOMSON, Judge, presiding.

FRANK A. McDONNELL, (THOMAS E. SWANSON, of counsel,) for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and FLOYD E. BRITTON, (EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. CHIEF JUSTICE STONE delivered the opinion of the court:

Plaintiffs in error, Henry Ullrich and Louis Ullrich, were convicted in the criminal court of Cook county, at the January term, 1921, of the charge of operating a confidence game and were sentenced to the penitentiary. The indictment consists of two counts,—one for larceny of $100 and the other for confidence game. At the close of the

People's case the State's attorney elected to proceed on the count for confidence game and took a *nolle pros.* on the larceny count.

The testimony of the People's witnesses tends to show the following: Charles W. Alsleben, a telegraph operator for the Illinois Central Railroad Company, read in a Chicago paper an advertisement inserted therein by Henry Ullrich & Co., as follows:

"FOR SALE—$50 cash, balance $10 monthly, buys beautiful ¼ and ½ acre chicken farm; new bldg.; 7c car fare.—155 N. Clark St., room 1620."

On March 7, 1920, Alsleben took the paper containing the above advertisement to the office of Henry Ullrich & Co. and met the plaintiff in error, Louis Ullrich. He informed Louis that he desired to purchase a place into which he could move by April first following. At this time Louis told Alsleben that he would build a place for him and have it completed in two or three weeks; that he would put men on the building to hurry it up. Alsleben gave Louis the sum of $3 and received in return a receipt therefor as part payment toward the purchase price of lots 7 and 8 in block 22 in Crane View Archer Avenue Home addition to Chicago. This was to be applied on the purchase price of $800. The above receipt was signed, "Henry Ullrich & Co. per Louis Ullrich." At this time Louis showed Alsleben a catalogue of Sears, Roebuck & Co., containing the picture of a building, with a description of it and dimensions of the rooms, and stated that his company could purchase the building at a discount of $800, which he could save Alsleben by constructing that particular building on the lots in question. After estimating the expense of gas, electric light and hot water heating plant, Louis estimated the cost to Alsleben to be $3400.

On March 8 Alsleben decided to take the lots provided the building would be constructed, but called the attention of Louis to the fact that the contract said nothing concern-

ing a building. On March 9 he paid the company $50 and
on March 15 $47, making, with the $3 previously paid, a
total of $100. On March 9 Alsleben again told Louis
that there was nothing in the contract about the building,
to which Louis replied that the building contract would
be separate but that the house would be built, and that
he would come to Alsleben's house a few days later with
an architect to draw up the plans and building contract.
A few days later Alsleben called the attention of Louis
to the fact that nothing had been done with reference to
the house, and was informed that the architect was busy
and could not come that day, and that he (Louis) would
let him know when the architect could come, and for
him not to worry.

Alsleben was later notified of the termination of the
tenancy of the house in which he then lived, which notice
he showed to Louis, who told him not to worry,—that he
would take care of him,—and advised him that a verbal
lease was good for one year and that the owner of the
building could not put him out. About the 25th of
March Alsleben asked Louis how he was getting along
with the building, and was told not to worry,—that he
would take care of him in case of trouble with his then
landlord. On March 29, when asked about the building,
Louis said that the company had suffered damage from a
tornado or cyclone at Melrose Park the day before and
would not be able to erect any buildings for some time.
About April 10 Henry Ullrich offered to sell Alsleben six
lots on Austin avenue, just north of Archer avenue, for
$2200 and credit him with the amount paid on the two
lots in question, and further offered to arrange for money
with which to build a small building in which Alsleben
could live until he could do better. This proposition Alsle-
ben declined, on the ground that he was not financially
able to carry out the terms proposed. On March 30 Als-
leben asked Henry Ullrich for the $100 paid on the lots in

question, and was informed that he could not take the lots back, as the $100 had been paid in to the firm.

It is contended that the record shows an entire failure of proof of the guilt of plaintiffs in error of the crime charged in the indictment, of which they stand convicted and sentenced, and that the verdict is based upon incompetent evidence of Morris Wilson, who testified with reference to certain complaints people had made to him while an investigator for the State's attorney's office, concerning the plaintiffs in error; that this testimony was prejudicial to the plaintiffs in error to such an extent that the judgment ought not to be allowed to stand, even though there may be enough evidence in the record in addition thereto to justify a conviction. Under the view we take of the admission of the testimony of the witness Wilson it is not necessary to discuss any other feature of the case.

Under the Confidence Game statute the offense consists in gaining possession of money or property by means of some trick or device or swindling operation in which advantage is taken of the confidence which the victim has reposed in the swindler. Evidence of transactions of a nature similar to those in question has been held admissible for the purpose of showing guilty knowledge. (People v. Lindley, 282 Ill. 377; People v. Baskin, 254 id. 509.) It has never, however, been the rule in this State that a witness can detail complaints which are, at best, hearsay evidence of other offenses. In this case the witness Wilson was allowed to state that he had conversation with the plaintiff in error Henry Ullrich concerning complaints made to the witness by different parties as to real estate transactions. The witness does not purport to state that he knew anything about these transactions or whether there was any confidence game practiced by the plaintiffs in error. His testimony is, at best, hearsay. While he does say that Henry Ullrich adjusted some of these complaints, and that as to others the witness appeared before the grand jury, none of such testi-

mony amounts to evidence of the commission of an offense similar to the one charged in the indictment in this case. Its introduction was palpable error. This testimony was of a highly prejudicial character, and its effect could only have been to inflame and prejudice the minds of the jurors.

For the admission of this testimony the judgment is reversed and the cause remanded.

*Reversed and remanded.*